**[Cite as *State v. Fitzpatrick*, 2026-Ohio-2523.]**

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 24CA4103 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | |
| | : | DECISION AND JUDGMENT |
| JOHNNY D. FITZPATRICK, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

---

APPEARANCES:

Karyn Justice, Portsmouth, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay Willis, Assistant Scioto County Prosecuting Attorney, Portsmouth, Ohio, for appellee.

---

Smith, P.J.

{¶1} Appellant, Johnny D. Fitzpatrick, appeals the judgment of the Scioto County Court of Common Pleas convicting him of two counts of aggravated trafficking in drugs, tampering with evidence, trafficking in cocaine, and trafficking in a fentanyl-related compound. On appeal, appellant contends 1) that his convictions were not supported by sufficient evidence and are against the manifest weight of the evidence and 2) that the trial court erred when it ordered

him to serve consecutive sentences. However, because we find no merit to his assignments of error, the judgment of the trial court is affirmed.

FACTS

{¶2} On September 13, 2023 law enforcement used a confidential informant to successfully conduct a controlled buy at a Campbell Avenue residence in Portsmouth. The next day, in addition to conducting surveillance on the Campbell Avenue residence, law enforcement executed a search warrant during which a large amount of suspected drugs, drug trafficking material, and drug paraphernalia were located throughout the residence. Present at the time of the execution of the warrant were the residents (appellant and Brandi Bevins) and Michael Lewis and Tony Walker, who resided in Dayton.

{¶3} On October 3, 2023, appellant, Bevins, Lewis, and Walker were indicted on nine counts, with counts one and two occurring on September 13, 2023, and counts three-nine occurring on September 14, 2023:

Count 1: aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1) and R.C. 2925.03(C)(1)(d), a second-degree felony;

Count 2: aggravated possession of drugs in violation of R.C. 29525.11(A) and R.C. 2911(C)(1)(c), a second-degree felony;

Count 3: aggravated trafficking of drugs in violation of R.C. 2925.03(A)(2) and R.C. 2925.03(C)(1)(d), a second-degree felony;

Count 4: aggravated possession of drugs in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(1)(c), a second-degree felony;

Count 5:  tampering with evidence in violation of R.C. 2921.12(A)(1) and R.C. 2921.12(B), a third-degree felony;

Count 6:  trafficking in cocaine in violation R.C. 2925.03(A)(2) and R.C. 2925.03(C)(4)(f), a first-degree felony;

Count 7:  possession of cocaine in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(4)(e), a first-degree felony;

Count 8:  trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2) and R.C. 2925.03(C)(9)(f), a first-degree felony; and

Count 9:  possession of a fentanyl-related compound in violation of R.C. 2925.11(A) and R.C. 2925.11(C)(11)(e), a first-degree felony.

The indictment also contained a forfeiture specification in counts three, six, seven, eight, and nine for $2,355 in cash.  Prior to trial, counts six and seven were amended to second-degree felonies.

{¶4} Appellant entered a not guilty plea and was tried before a jury along with co-defendant Bevins on September 16, 2024.  At the trial, the State adduced evidence that the Southern Ohio Drug Task Force ("SODTF") conducted a controlled buy from Lewis at the Campbell Avenue residence using a confidential informant. This confidential informant had purchased drugs at the same Campbell Avenue residence three or four times before.  On September 13, 2023, the confidential informant entered the Campbell Avenue residence with buy money and a recording device provided by the SODTF and purchased what later tested as 29.23 grams of methamphetamine.

{¶5} The SODTF had received information that there were large amounts of drugs being sold at the Campbell Avenue residence, and also that people were seen coming and going from the residence. As the SODTF members and other witnesses described, the Campbell Avenue residence had the markings of a "trap house." A "trap house" is a place where the residents have allowed various people to enter a residence for some benefit and the house then becomes a place for selling, using, and stashing drugs – a sort of "convenience store" for drug activity. The confidential informant, who testified, also characterized the Campbell Avenue residence as a "trap house."

{¶6} The SODTF obtained a search warrant for the Campbell Avenue residence, a shotgun-style, single-family dwelling. On September 14, 2023, members of the SODTF began surveilling the residence about 7:00 a.m. and they executed the search warrant at 10:30 a.m. When entering the residence, SODTF realized from the design of the home, someone in the rear bedroom could see what was going on in the front room, and vice versa. The house had debris and trash throughout. In the kitchen, the SODTF saw Lewis. From the kitchen, they could also see appellant seated on a chair in the living room. The SODTF found large amounts of a crystal-like substance (methamphetamine or its byproduct), scattered all over the floor in the living room. In fact, the drugs on the floor were so apparent that members of the SODTF did not have to get on their hands and knees

to see them.  The methamphetamine in the living room was spread around appellant and on his person.

{¶7} The SODTF found Walker and Bevins in the front room of the residence.  They also found methamphetamine on the floor around where Bevins was located, but not on her person.  The SODTF found syringes and a spoon near Bevins.

{¶8} In addition to the drugs seen out in the open in several rooms of the house, law enforcement saw drug paraphernalia including syringes, bindles (papers used to package drugs), digital scales, a razorblade and credit card used for cutting and packaging drugs, cell phones, a bag full of numerous empty clear plastic capsules used for drug trafficking, baggies, and a large amount of lottery tickets folded into bindles.  Law enforcement found a large amount of the bindles in both the living room and front room located near appellant and Bevins.  Law enforcement also found a torn plastic baggie in the room where appellant was.  In addition, law enforcement found a large amount of cash in excess of $2,300 on Lewis, including marked money from the controlled buy the day before.

{¶9} During the search, appellant said he resided there at the Campbell Avenue house.  The State also introduced evidence of documents that were signed by appellant showing his address as the Campbell Avenue residence.

{¶10} In an interview with law enforcement, Bevins said she had been living at the Campbell Avenue residence for approximately five months prior to the date of the search, that she had been dating appellant for about three months prior to the search, and that both had resided at the Campbell Avenue residence. Bevins claimed that Lewis had initially pushed his way in the house at Campbell Avenue to sell drugs. However, testimony revealed that law enforcement received no calls that drug dealers pushed their way into appellant's home. Later, Bevins admitted that she had agreed to let Lewis stay there if he would pay the water bill. She claimed that she had received no money from Lewis because he had only arrived two days prior to the execution of the search warrant.

{¶11} Bevins also said that when Lewis arrived, he initially had three softball-sized bags of drugs, which the SODTF explained was a large amount of drugs. Bevins said that a week prior to the search warrant Lewis sent his sister and a male named "DJ" to the Campbell Avenue residence to trap and sell drugs for a few days. Bevins said that when Lewis arrived, he sent text messages out to multiple individuals offering up free "testers" of drugs. Those free "testers" were in small, folded lottery tickets containing the tenth of a gram of drugs. The SODTF explained that this was Lewis' attempt to build a client base. Bevins said that Walker was Lewis' "assistant." During the search, the SODTF members observed Bevins, Lewis, and Walker speaking to one another, back and forth.

{¶12} At trial, Detective Metzler of the SODTF explained the course and scope of drug trafficking that the task force investigates. In particular, Metzler described a source city where the drug originates (like Dayton, where Lewis and Taylor were from) being shipped to the destination city (like Portsmouth) where it is sold and used. Metzler described the need for the task force to use confidential informants to stop distribution and sale. In addition, Metzler described the street terminology for various drugs and their appearance. Finally, Metzler explained that the "user amounts" of drugs are those in the range of a gram or two. However, due to the expense of the drugs, the task force sees the amounts of quarter pounds to pounds of the drug in the possession of those who are trafficking drugs.

{¶13} In addition to testimony from the confidential informant and members of the SODTF, the State also called to testify a male drug purchaser whose drugs of choice were cocaine and fentanyl. This drug purchaser testified he had purchased drugs from Lewis at the Campbell Avenue residence before ("a half-dozen times"), which the drug purchaser would describe as a "trap house." This drug purchaser testified that Lewis gave out "free testers."

{¶14} The day of the search warrant, the drug purchaser received a text from Lewis to come get a "test product" of cocaine and fentanyl at the residence. This drug purchaser went to get the product that day and testified that the people who lived in the Campbell Avenue residence were there when he smoked crack cocaine

and injected fentanyl in the house, although he did not get the drugs off the residents. Another black male was also there. This drug purchaser said that fentanyl and cocaine were out in the open and being sold there. The SODTF came while the drug purchaser was there.

{¶15} Further, the SODTF members testified that a female drug purchaser showed up during the search warrant with $10 on her person. This amount is enough to purchase a bindle of meth, which is the going rate for a tenth of a gram.

{¶16} The State presented testimony from the BCI Crime Lab forensic scientist regarding the identity and amounts of the following substances seized the day of the search: xylazine and fentanyl - less than .1 gram; methamphetamine - 9.09 grams; methamphetamine - 20.11 grams; cocaine - 7.77 grams; cocaine - 13.18 grams; methamphetamine - 7.85 grams; xylazine and fentanyl - 1.48 grams; xylazine and fentanyl - 1.78 grams; xylazine and fentanyl - 2.44 grams; xylazine and fentanyl - 14.22 grams; xylazine and fentanyl - .41 grams; methamphetamine - 1.23 grams; and methamphetamine - 5.8 grams. Some of these items were in separate paper folded lottery tickets (bindles) as if packaged for individual sale.

{¶17} At the close of evidence in the State's case, appellant and Bevins moved for Crim.R. 29 acquittal. Bevins made a general argument, but appellant's counsel argued that the State had only shown that Lewis was trafficking, but that appellant was not complicit in the activities of Lewis. The trial court overruled the

motions.  During closing arguments, the State suggested that appellant and Bevins were guilty of trafficking under a complicity theory.

{¶18} Appellant testified in his own defense.  Appellant testified that he did not reside at the Campbell Avenue residence at the time of the search warrant or before, but only moved to the residence after the indictment.  Though his testimony conflicted, he did admit that he stayed there at times.  He said that Bevins must have been lying when she said that he had been living there the months before the search.  Appellant denied he was in the Campbell Avenue residence when the buy took place on September 13.  The day of the search, he claims that drugs were all over the place because Lewis threw them all over the place.  He claimed that the drugs got on his person when the SWAT team ordered everyone to "get on the ground," and he was put on the floor in the process of trying to arrest him.  However, members of the task force claimed he was seated in a chair when they entered the residence.  Appellant also claimed that he did not start seeing Bevins until after the offense, and that Bevins lied when she said he had been living there for the months leading up to the search.  At trial, he said, "we didn't let nobody in the house.  Evidently, they went in without permission."  Appellant previously served more than seven years in federal prison for a carjacking conviction and also had a conviction for possession of drugs in Scioto County.

{¶19} The jury found appellant guilty of all counts of the indictment. The trial court merged certain counts, and the State made election of offenses for sentencing. Ultimately, appellant was convicted of counts one, three, five, six, and eight. For these offenses, appellant was sentenced to 3 years on count one; 6 years on count three; 3 years on count five; 6 years on count six, and 10 to 15 years on count eight. The trial court ordered the sentences for counts one, three, six and eight to be served consecutively, and count five to be served concurrently to count one. Appellant's total prison term consisted of 25-30 years. Appellant submitted a timely notice of appeal and raises two assignments of error.

## ASSIGNMENTS OF ERROR

I.      MR. FITZPATRICK'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

II.     THE COURT ERRED WHEN IT ORDERED MR. FITZPATRICK TO SERVE CONSECUTIVE SENTENCES.

## ASSIGNMENT OF ERROR I

{¶20} In his first assignment of error, appellant contends that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. Although the appellant was convicted of tampering with evidence, his trial counsel and counsel on appeal couch their arguments in terms of whether appellant is guilty of the trafficking counts. On appeal, appellant does not develop an argument regarding the tampering with evidence conviction. The State counters

that the jury did not believe appellant's testimony. The State argues that

appellant's participation in trafficking went beyond mere presence in the Campbell

Avenue residence; rather, the State claims it was clear that appellant also resided

there and knew about the trafficking. The State asserts that not only was crystal

methamphetamine all over the house but other items were present that showed

trafficking was occurring there.

Standard of Review

{¶21} Because appellant challenges both the sufficiency of the evidence and

the manifest weight of the evidence, we initially set forth both standards of review.

{¶22} A claim of insufficient evidence invokes a due process concern and

raises the question of whether the evidence is legally sufficient to support the

verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997),

syllabus; *State v. Blevins*, 2019-Ohio-2744, ¶ 18 (4th Dist.). When reviewing the

sufficiency of the evidence, an appellate court's inquiry focuses primarily on the

adequacy of the evidence; that is, whether the evidence, if believed, could

reasonably support a finding of guilt beyond a reasonable doubt. *Id.* at syllabus.

The standard of review is whether, after viewing the probative evidence and

inferences reasonably drawn therefrom in the light most favorable to the

prosecution, any rational trier of fact could have found all the essential elements of

the offense beyond a reasonable doubt. *E.g., Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

{¶23} Furthermore, under the sufficiency of the evidence standard, a reviewing court does not assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins*, *supra*, at 390 (Cook, J., concurring). Therefore, when reviewing a sufficiency of the evidence claim, an appellate court must construe the evidence in a light most favorable to the prosecution. *See, e.g., State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477 (1993). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶24} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins*, *supra*, at 387. "The question to be answered when a manifest weight issue is raised is whether 'there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 81, quoting *State v. Getsy*, 84 Ohio St.3d 180, 193-194 (1998),

citing *State v. Eley*, 56 Ohio St.2d 169 (1978), syllabus.  A court that considers a manifest weight challenge must " 'review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses.' " *State v. Beasley*, 2018-Ohio-493, ¶ 208, quoting *State v. McKelton*, 2016-Ohio-5735, ¶ 328.  However, the reviewing court must bear in mind that credibility generally is an issue for the trier of fact to resolve.  *State v. Issa*, 93 Ohio St.3d 49, 67 (2001); *State v. Murphy*, 2008-Ohio-1744, ¶ 31 (4th Dist.).  " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.' " *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20, quoting *State v. Konya*, 2006-Ohio-6312, ¶ 6 (2d Dist.), in turn quoting *State v. Lawson*, 1997 WL 476684 (2d Dist. Aug. 22, 1997).

{¶25} Thus, an appellate court will generally defer to the trier of fact on evidence weight and credibility issues, as long as a rational basis exists in the record for the fact-finder's determination.  *State v. Picklesimer*, 2012-Ohio-1282, ¶ 24 (4th Dist.); *accord State v. Howard*, 2007-Ohio-6331, ¶ 6 (4th Dist.) ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight.").  Accordingly, if the prosecution presented substantial credible evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the

offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *Accord Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins, supra*, at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990) (a judgment is not against the manifest weight of the evidence when " ' "the greater amount of credible evidence" ' " supports it).

{¶26} Consequently, when a court reviews a manifest weight of the evidence claim, a court may reverse a judgment of conviction only if it appears that the fact-finder, when it resolved the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins, supra*, at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord McKelton* at ¶ 328. Finally, a reviewing court should find a conviction against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins, supra*, at 387, quoting *Martin*, *supra*, at 175; *accord State v. Clinton*, 2017-Ohio-9423, ¶ 166; *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

Legal Analysis

{¶27} At the outset, we acknowledge that for each drug offense count of the indictment the State was required to prove the identity and amount of drugs recovered. However, appellant does not take issue with these elements.

Appellant's arguments focus solely on whether he was complicit in the trafficking of the drugs themselves, as the State alleged at trial. We therefore limit our discussion accordingly.

### September 13, 2023 - Count One

{¶28} Count one of the indictment alleges that appellant committed aggravated trafficking in drugs, pursuant to R.C. 2925.03(A)(1) and (C)(1)(d). Relevant to our discussion, R.C. 2925.03(A)(1) provides: "[n]o person shall knowingly * * * sell or offer to sell a controlled substance or a controlled substance analog." R.C. 2901.22(B) defines the culpable state of "knowingly":

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶29} R.C. 2923.03(A)(2) states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." " 'A conviction for aiding and abetting under R.C. 2923.03(A)(2) requires the state to prove, beyond a reasonable doubt, "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the

criminal intent of the principal." ' " *State v. Crumpton,* 2024-Ohio-5064, ¶ 30 (4th Dist.), quoting *State v. Smith*, 2022-Ohio-371, ¶ 53 (4th Dist.), quoting *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. " ' "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." ' " *Id.,* quoting *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971). Yet, " ' "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." ' " *Id.,* quoting *Johnson* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). " 'This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission.' " *Id.*

{¶30} Further, "[a] person's mere association with a principal offender is not enough to sustain a conviction based on aiding and abetting; there must be some level of active participation by way of providing assistance or encouragement." *State v. Anderson,* 2009-Ohio-2521, ¶ 25 (12th Dist.), citing *State v. Mootispaw*, 110 Ohio App.3d 566, 570 (4th Dist. 1996). "Criminal intent, however, can be inferred from the presence, companionship and conduct of a criminal defendant both before and after the offense is committed and may be proven by either direct or circumstantial evidence." *Id.;* citing *Mootispaw* at 570, citing *State v. McKnight,* 2002-Ohio-1971, ¶ 23 (4th Dist.).

{¶31} " 'We further observe that the complicity statute does not require the state to charge the defendant with complicity.' " *Crumpton,* 2024-Ohio-5064, ¶ 31 (4th Dist.), quoting *Smith* at ¶ 54. " 'Instead, R.C. 2923.03(F) allows the state to charge the defendant as a principal offender: "[a] charge of complicity may be stated in terms of [the complicity statute], or in terms of the principal offense." ' " (Bracketed material in original.) *Id.*, quoting R.C. 2923.03(F).

{¶32} The State presented testimony that this offense occurred on September 13, 2023 at 408 Campbell Avenue, when Lewis sold approximately 29 grams (roughly an ounce) of methamphetamine. Appellant's residence was 408 Campell Avenue and a trap house, where large amounts of drugs were being sold and people were coming and going at different times. It was the base of operation for the drugs sales, or a "convenience store" for drugs where a large amount of drugs were found and stored. The confidential informant and the officers described the buy at trial, and video evidence supported their testimony. While it is true that appellant is not seen on the buy video, nor did the confidential informant testify to appellant's presence during that specific buy, it is also clear that appellant knew full well that Lewis was selling drugs from his residence. His girlfriend and accomplice cooperated and encouraged Lewis by entering an agreement with Lewis for which she received a benefit (him agreeing to pay the water bill). Circumstantial evidence obtained during the execution of the search warrant also

supports the jury's finding of guilt regarding the controlled buy because the bulk of the drugs were actually found in the room where the task force found appellant, and drugs were found on his person. He also attempted to hide or conceal, and was convicted of the tampering charge, which shows that he had knowledge of the criminal nature of the enterprise. Circumstantial evidence also showed that appellant received a benefit of drugs as part of the payment for allowing Lewis to sell out of the home, because the State presented evidence that he was attempting to purchase a drug which assists with drug withdrawals (suboxone) when he was in the county jail awaiting trial.

{¶33} Appellant claimed that he did not aid or abet the principal offenders because he was supposedly staying at a motel in Wheelersburg. However, rather than mere association with Lewis, appellant clearly had the culpability of the principal of the count one trafficking offense. The jury apparently did not believe appellant's testimony. Bevins told law enforcement that when Lewis arrived at her home, he had three softball-size bags of drugs, and that Lewis had sold drugs at her house within at least the past week. Bevins also said she knew he sent out "testers" or samples out to drug users. Evidence at the trial showed that both before and during the execution of the search warrant, at least two other people in addition to the confidential informant either purchased or attempted to purchase drugs from that location when appellant was present. In fact, a purchase was made by a user

who injected fentanyl and smoked crack cocaine in the residence while the residents were there. Thus, the State presented concrete evidence of three persons who had purchased or attempted to purchase drugs at the Campbell Avenue residence, and also that at least some of the persons were at the residence multiple times to purchase drugs.

{¶34} The State established that the principal actor involving count one was Lewis, who was from the Dayton area, which is a source city. The task force members also explained the course of trafficking where members from a source city seek out persons of a destination city (Portsmouth) to sell drugs. Appellant and Bevins clearly provided a place in Portsmouth, described as a type of "convenience store," where Lewis could sell the drugs. In addition to providing the place to sell drugs, it is clear the drugs were kept in the residence where appellant resided with Bevins. Bevins admitted she had agreed to allow the sale of drugs from her residence in exchange for Lewis' promise to pay the water bill. Bevins admitted that she knew about Lewis selling from the home "a couple days before" and others selling drugs a week prior. Additionally, while the controlled buy occurred on September 13, the evidence obtained during the search warrant, and the testimony from the confidential informant and drug purchaser, constitute significant circumstantial evidence that appellant knew about and provided a safe haven/locale for the drug business during the controlled buy of September 13.

{¶35} Appellate courts have held that the providing of a place to sell and store drugs is sufficient involvement for a drug trafficking conviction. *See, e.g., State v. Reid*, 2012-Oho-5124, ¶ 41-42 (11th Dist.) (defendant guilty of drug trafficking when he rented the house where drug sale took place and police later recovered the drugs packaged for sale); *State v. Kidd*, 2007-Ohio-4113, ¶ 54 (11th Dist.) (where court held complicity instruction was proper because "[i]f for the sake of argument, [defendant's] role in these activities were nothing more than allowing them to occur in the apartment, she could be found guilty of complicity"); *State v. Scott*, 2007-Ohio-303, ¶ 36-42 (5th Dist.) (complicity convictions supported by sufficient evidence where drug buys occurred at [the defendant's] residence and drugs, paraphernalia, and firearms were found in her bedroom). Thus, even though the confidential informant did not see the appellant on the day he purchased the drugs, the manifest weight of the evidence supports the jury's finding that appellant was complicit in the September 13 controlled buy.

September 14, 2023 - Counts Three, Six and Eight

{¶36} Similarly, there is also substantial evidence that appellant is guilty of counts three, six, and eight, under a complicity theory. He also claims he had no control over the residence or drugs and did not participate in the activity in any way. Appellant's convictions related to these counts involve drug trafficking under R.C. 2925.03(A)(2). The definition of drug trafficking under R.C.

2925.03(A)(2). R.C. 2925.03(A)(2) states: "[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person."

{¶37} Ohio courts have held that a drug trafficking conviction under a complicity theory does *not* require that the accomplice offender possess the drugs, as long as the State proves the principal offender possessed the drugs incident to the trafficking. *See, e.g.*, *State v. McGowan,* 2005-Ohio-1335 ¶ 18-22 (7th Dist.) (conviction upheld where the defendant provided transportation to facilitate a drug sale, even though he never possessed the drugs); *State v. Wilcoxen,* 2003-Ohio-6061, ¶ 13 (2d Dist.) (evidence sufficient for drug trafficking under a complicity theory where defendant permitted the principal offender to carry on the drug sales from her home and shared in the proceeds of the sale); *State v. Peavy,* 2002-Ohio-5067, ¶ 11, 27 (8th Dist.) (where court upheld a conviction for trafficking when defendant acted as a look out and was complicit to the drug trafficking even though he himself did not possess the drugs).

{¶38} However, in the instant case, there is ample evidence that appellant both constructively possessed and had actual possession over some of the drugs, as

they were found on his person.  Ample evidence shows appellant was an accomplice to Lewis in the drug trafficking offenses related to the September 14, 2023 search warrant.  Not only was he present during the sale to the male drug purchaser that day as well as when the female potential buyer showed up, he worked with Bevins to provide the trap house residence for the transaction.

{¶39} " 'To sustain an R.C. 2925.03(A)(2) trafficking conviction as a *principal* offender, the state must prove that a defendant had control over, *i.e.*, possessed, the illegal substance.' " *State v. Crumpton,* 2024-Ohio-5064, ¶ 32 (4th Dist.) (Emphasis added.), quoting *State v. Smith*, 2022-Ohio-371, ¶ 59 (4th Dist.), citing *State v. Cabrales*, 2008-Ohio-1625, ¶ 30.  In the instant case, the State presented a large amount of evidence that Lewis, the principal, possessed the drugs.  In contrast, the State presented evidence that appellant was an accomplice, and not the principle of the drug trafficking offenses.

{¶40} Possession "means having control over a thing or substance but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).  " 'Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession.' " *State v. Carr,* 2025-Ohio-2583, ¶ 27 (4th Dist.), quoting *State v. Hankerson,* 70 Ohio St.2d 87, (1982),

syllabus.  "For constructive possession to exist, the state must show that the

defendant was conscious of the object's presence."  *Id.,* citing *Hankerson,* 70 Ohio

St.2d at 91; *State v. Kingsland*, 2008-Ohio-4148, ¶ 13 (4th Dist.).  "Both dominion

and control, and whether a person was conscious of the object's presence, may be

established through circumstantial evidence."  *Carr* at ¶ 28, citing *State v. Foster,*

2023-Ohio-746, ¶ 27 (4th Dist.) and *State v. Brown*, 2009-Ohio-5390, ¶ 19 (4th

Dist.).

{¶41}  " 'Furthermore, to establish constructive possession the state need not

show that the defendant had "[e]xclusive control" over the contraband.' " *Carr* at

¶ 29, quoting *State v. Whitehead,* 2020-Ohio-479, ¶ 91 (4th Dist.), quoting *State v.*

*Tyler,* 2013-Ohio-5242, ¶ 24 (8th Dist.).  Additionally, "[m]ultiple persons may

have joint constructive possession of an object."  *Id.,* citing *State v. Philpott,* 2020-

Ohio-5267, ¶ 67 (8th Dist.); *State v. Wolery,* 46 Ohio St.2d 316, 332-329

("[p]ossession * * * may be individual or joint" and "control or dominion may be

achieved through the instrumentality of another").  Further, "[a]lthough a

defendant's mere proximity is in itself insufficient to establish constructive

possession, proximity to the object may constitute some evidence of constructive

possession."  *State v. Price-Tuggle,* 2026-Ohio-1027,¶ 43 (4th Dist.), citing *State v.*

*Fry*, 2004-Ohio-5747, ¶ 40 (4th Dist.).  Thus, " 'presence in the vicinity of

contraband, coupled with another factor or factors probative of dominion or control

over the contraband, may establish constructive possession.' " *Id.,* quoting

*Kingsland*, 2008-Ohio-4148, ¶ 13 (4th Dist.).

{¶42} Here, drugs were actually found on appellant, and surrounding him on

the floor was a torn baggie and crystal meth to where it appeared he attempted to

destroy or render unusable at least some of the evidence when the SWAT team

entered the residence. Further, the State introduced evidence that appellant

constructively possessed the drugs because a large quantity of the drugs were

actually found in the room where he was located, and the circumstantial evidence

showed appellant knew they were there. Not only were large quantities of various

drugs found throughout the home where appellant resided in amounts that

exceeded personal use amounts, but a good quantity were wrapped for individual

sale. In addition, these drugs were found in the common areas of the small

residence sitting out in plain view. The testimony showed that one could see the

drugs and actions of others in the home from one end of the residence to another.

Appellant's actions of trying to conceal or alter the evidence taken with the large

amount of drugs throughout and found on his person shows his knowledge of the

drugs and the activities going on in that house. In fact, there is circumstantial

evidence from the large amount of bindles found in the small room where he was

located that he may personally have been packaging or assisting with the inventory

of the drugs themselves. The exhibit that shows the empty capsules used for drug

packaging in the bathroom of the home and their location seems to link their presence more with the residents of the home, than with Lewis or Taylor. Thus, it is clear that appellant possessed and prepared the drugs for sale, along with Lewis.

{¶43} Further, the amounts of the drugs found is circumstantial evidence of drug trafficking, because "possession of a large quantity of narcotics is commonly recognized as significant circumstantial evidence of intent to distribute in narcotics." *State v. Robison*, 2026-Ohio-1223, ¶ 34 (4th Dist.), citing 1 Wharton's Criminal Evidence § 3:5 (15th ed.). "Possession of a large quantity of drugs, large amounts of cash, plastic baggies, and scales, among other indicia of trafficking, provide persuasive circumstantial evidence that tends to prove a violation of R.C. 2925.03(A)(2)." *State v. Birdsong*, 2024-Ohio-1744, ¶ 43 (11th Dist.), citing *State v. Floyd*, 2019-Ohio-4878, ¶ 32 (7th Dist.). In addition to the drug paraphernalia, individually packaged drugs, and drugs on the floor of the front room, in other areas of the house there were two scales, cell phones, credit cards and a razorblade for cutting drugs, lotto tickets used to bindle the drugs for individual sale, and a large amount of money found on Lewis in the kitchen. The bulk of the drugs, including those packaged for individual sale, was found in the room where appellant was located. "It has long been established that otherwise innocuous objects such as bags, money, or cell phones can be used as criminal tools in drug trafficking and these items may constitute circumstantial evidence for drug

trafficking." *State v. Cobb,* 2024-Ohio-458, ¶ 17 (8th Dist.), citing *State v. Hawthorne*, 2016-Ohio-203, ¶ 21 (8th Dist.), citing *State v. Bowling*, 2010-Ohio-3595, ¶ 60 (8th Dist.). Accordingly, while some of these items could be typical household items, in this instance, they were not.

{¶44} Moreover, the State adduced testimony that at least three individuals had attempted or had bought drugs at the residence (conclusively twice when appellant was there), as well as testimony from witnesses that the residence was a "trap house." During trial the confidential informant said he had been to the house to purchase drugs three or four times, the male drug user said he had been there a half dozen times, and then another female drug purchaser showed up the day of the search. Additionally, what can be gleaned from Bevins' statement is that more than one person was selling drugs from the Campbell Avenue residence. Task force members also explained to the jury the drug trafficking trade and such things as what would constitute personal use amounts for drugs, versus amounts found in trafficking operations.

{¶45} In sum, our review of the record shows that the State adduced ample credible evidence to sustain the convictions. We do not believe that the evidence weighs heavily against appellant's convictions, under a theory of complicity for count one and clearly under a theory of complicity for counts three, six, and eight. We therefore overrule appellant's first assignment of error.

## ASSIGNMENT OF ERROR II

{¶46} In his second assignment of error, appellant contends that the trial court erred when it imposed consecutive sentences. Appellant argues that his conduct does not warrant the sentence he received. Further, appellant claims that Lewis was the principal offender. He also asserts that the harm caused by the multiple offenses was not so great or unusual to justify consecutive sentences. The State submits that appellant's lengthy history of prior felony convictions and the multiple controlled substances found in the Campbell Avenue residence render the trial court's sentences appropriate. As such, the State emphasized that the consecutive sentences were necessary to protect the public from controlled substances being brought into and trafficked within Scioto County.

### Standard of Review

{¶47} When reviewing felony sentences, appellate courts apply the standard set forth in R.C. 2953.08(G)(2). *State v. Spencer*, 2024-Ohio-59, ¶ 13 (4th Dist.). *See e.g.*, *State v. Nelson*, 2023-Ohio-3566, ¶ 63 (4th Dist.). R.C. 2953.08(G)(2)(a) provides that "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." Instead, the statute authorizes appellate courts to "increase, reduce, or otherwise modify a sentence" "if it clearly and convincingly finds either of the following:"

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division

(B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶48} The Supreme Court of Ohio has recognized that R.C. 2953.08(G)(2) means that appellate courts ordinarily " 'defer to trial courts' broad discretion in making sentencing decisions.' " *State v. Gwynne*, 2023-Ohio-3851, ¶ 11, quoting *State v. Rahab*, 2017-Ohio-1401, ¶ 10; *see also State v. Marcum*, 2016-Ohio-1002, ¶ 23 (appellate court's review of whether sentence is clearly and convincingly contrary to law under R.C. 2953.08(G) is deferential to sentencing court); *State v. Collins*, 2024-Ohio-2891, ¶ 22 (4th Dist.).  Thus, R.C. 2953.08(G)(2) provides that an appellate court may increase, reduce, or otherwise modify consecutive sentences only if the record does not "clearly and convincingly" support the trial court's R.C. 2929.14(C)(4) consecutive-sentence findings.  The clear-and-convincing standard for appellate review in R.C. 2953.08(G)(2) is written in the negative.  *Gwynne*, *supra*, at ¶ 13.  Moreover, "clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶49} In general, a statutory presumption exists in favor of concurrent sentences pursuant to R.C. 2929.41(A) and R.C. 2929.14(C)(4) governs the imposition of consecutive terms of imprisonment. Collins, *supra*, at ¶ 23. To justify the imposition of consecutive terms of imprisonment, "a trial court must make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but the court has no obligation to state reasons to support its findings." *State v. Blair*, 2019-Ohio-2768 ¶ 52 (4th Dist.), citing *State v. Bonnell*, 2014-Ohio-3177, syllabus. This Court has explained the findings required to support the imposition of consecutive sentences as follows:

> Under the tripartite procedure set forth in R.C. 2929.14(C)(4), prior to imposing consecutive sentences a trial court must find that: (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of three circumstances specified in the statute applies.

(Emphasis added.) *Cottrill* at ¶ 14, and *Collins* at ¶ 24, quoting R.C. 2929.14(C)(4)(a)-(c).

{¶50} Further, as we outlined in *Cottrill*, and more recently in *Collins*, the three circumstances are:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

(Emphasis added.) *Cottrill* at ¶ 14, and *Collins* at ¶ 24, quoting R.C. 2929.14(C)(4)(a)-(c).

## Legal Analysis.

{¶51} Appellant does not argue that the trial court did not make the necessary findings at the sentencing hearing or in the sentencing entry. Instead, he claims that his conduct did not warrant the imposition of consecutive sentences totaling 25 to 30 years in prison. He claims his role was limited, and his conduct was not so great or unusual as to justify consecutive sentences.

{¶52} Appellant argues that the evidence demonstrates that other individuals, and not appellant, were distributing drugs from the home. The record supports the trial court's sentence, however, because the task force members testified that the drug trade occurs in some instances where dealers from a source city seek out a target in a destination city to sell drugs. The fact that appellant opened up his residence resulted in a large amount of drugs being introduced into the region.

Further, as the State argued at sentencing, more than one individual was using the residence for distribution (not just Lewis) and a substantial amount of narcotics were being trafficked there. Witnesses described the residence as a "trap house," or "convenience store" for drug sales. We also observed that the amount of packaging material and drugs were not just found throughout the home but were directly tied to appellant.

{¶53} While appellant cites the fact he at the most aided and abetted and was not the principal offender, these offenses were committed as part of a course of conduct, since numerous drug buys occurred at this residence. The record reflects that multiple types of drugs were being sold from the residence. Although most of the drugs were found at the same time, there was abundant evidence that transactions at the residence occurred on multiple days with multiple users and in the space of a few hours in the morning two drug users had already stopped by to purchase drugs. For example, in Bevins' statement, she indicated that Lewis was giving out "testers" or samples of the product to build clientele in the Scioto County area. The trial court could glean from this fact that appellant's actions resulted in significant harm to the community and appellant's culpability was more serious than someone who merely assisted one or two isolated buys of lesser amounts of drugs.

{¶54} In addition, other factors in appellant's case are present in the record to warrant his lengthy prison term. For instance, pending trial, appellant picked up three separate felony indictments including first and second-degree felonies of a violent nature. He had a felony conviction record dating back to 1998, including but not limited to trafficking in marijuana, aggravated robbery, carjacking (for which he received an 87-month prison sentence), and felony drug possession. Further, appellant showed no remorse for his conduct.

{¶55} Based on the foregoing, we cannot find that the trial court's sentence is clearly and convincingly unsupported by the record. Furthermore, we cannot find that the record clearly and convincingly shows that appellant's sentence is contrary to law. Accordingly, we overrule the second assignment of error.

{¶56} Having found no merit to either of appellant's assignments of error, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

# JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period set forth in the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Wilkin, J. concur in Judgment and opinion.

For the Court,

_____
Jason A. Smith
Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**